**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X    Case No.
NIKEIA WILLIAMS,

                         Plaintiff,                                      **COMPLAINT**

          - against -

CABRINI OF WESTCHESTER, CHARMAINE                      **PLAINTIFF DEMANDS**
THOMAS, *Individually* and MARGO BARRETT              **A TRIAL BY JURY**
*Individually*,

                         Defendants.
-------------------------------------------------------------X

          Plaintiff NIKEIA WILLIAMS by her attorneys, PHILLIPS & ASSOCIATES, Attorneys

at Law, PLLC, hereby complains of Defendants, upon personal knowledge, as well as

information and belief, by alleging and averring as follows:

## NATURE OF THE CASE

1.     Plaintiff brings this action alleging that Defendants have violated Title VII of the Civil

Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978

and by the Civil Rights Act of 1991, Pub. L. No. 102-166) ("Title VII") and the New York

State Human Rights Law, New York State Executive Law § 296, *et seq.* ("NYSHRL") by

subjecting her to discrimination on the basis of race/national origin (Black American) and

perceived disability, as well as retaliation for complaining of discrimination.

## JURISDICTION, VENUE AND PROCEDURAL PREREQUISITES

2.     Jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. §§ 1331

and 1343.

3.     This Court has supplemental jurisdiction over Plaintiff WILLIAMS' claims brought under

state law pursuant to 28 U.S.C. § 1367.

1

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as one or more Defendants reside within the Southern District of New York and a substantial part of the events or omissions giving rise to the claim occurred therein.

5. By timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on June 7, 2021, receiving a Notice of Right to Sue from the EEOC dated October 28, 2021 and commencing this action within 90 days of the issuance of the Notice of Right to Sue by the EEOC, Plaintiff WILLIAMS has satisfied all of the procedural prerequisites for the commencement of the instant action. A copy of the Notice of Right to Sue is annexed hereto as Exhibit A.

## THE PARTIES

6. At all times relevant hereto, Plaintiff NIKEIA WILLIAMS ("WILLIAMS") was and is a resident of the State of New York, Dutchess County.

7. At all times relevant hereto, Defendant CABRINI OF WESTCHESTER (hereinafter "CABRINI") was and is an active not-for-profit corporation existing under the laws of the State of New York.

8. At all times relevant hereto, Defendant CABRINI has a principal place of business located at 115 Broadway, Dobbs Ferry, NY 10522.

9. At all times relevant hereto, Plaintiff was and is an employee of Defendant CABRINI.

10. Upon information and belief, at times relevant hereto, Defendant CHARMAINE THOMAS ("THOMAS") was an employee of Defendant CABRINI.

11. Upon information and belief, Defendant THOMAS held the position of "Charge Nurse" and had the authority to affect the terms and conditions of Plaintiff's employment or to otherwise influence the decision making regarding same.

12. Upon information and belief, at times relevant hereto, Defendant MARGO BARRETT ("BARRETT") was and is an employee of Defendant CABRINI.

13. Upon information and belief, Defendant BARRETT held the position of "Nursing Manager" and had the authority to affect the terms and conditions of Plaintiff's employment or to otherwise influence the decision making regarding same.

14. Defendant CABRINI, Defendant THOMAS, and Defendant BARRETT are sometimes collectively referred to herein as "Defendants."

## MATERIAL FACTS

15. Plaintiff WILLIAMS began her employment with Defendant CABRINI on or about May 13, 2003 as a "Certified Nursing Assistant" (hereinafter "CNA").

16. In her capacity as CNA, Plaintiff WILLIAMS' job duties and responsibilities consisted of helping elderly residents get dressed, eat, use the restroom, and otherwise assist the residents with day-to-day functions that they could not perform on their own.

17. From approximately 2003 to 2006, Plaintiff WILLIAMS was a part-time floater CNA. As such, she would be assigned to different floors and patients from 7:00 a.m. to 3:00 p.m.

18. In or around 2006, Plaintiff WILLIAMS became a full-time floater.

19. Then, in or around 2017, Simone Faulkner-Smith, VP-Human Resources, informed the Plaintiff that a permanent CNA position had become available at Defendant CABRINI's One West Unit.

20. Ms. Faulkner-Smith encouraged Plaintiff WILLIAMS to take the assignment, as it would be a permanent assignment and Plaintiff would work in one unit.

21. At the One West Unit, Plaintiff WILLIAMS would work with a rehabilitation population of different abilities.

22. By way of explanation, a floater position requires a floater CNA to care for various patients and work in approximately six units in different buildings throughout a week, covering for other CNAs, as needed.

23. Thus, a permanent CNA position would provide more stability for Plaintiff WILLIAMS.

24. As such, in or around 2017, Plaintiff WILLIAMS began working at the One West Unit as a permanent CNA.

25. This was a coveted placement for a CNA because patients were able to manage daily tasks on their own.

26. When Plaintiff WILLIAMS started working at the One West Unit as a permanent CNA, the nurses informed Plaintiff that she was taking over Assignment Three as a permanent assignment. Upon information and belief, this was previously the assignment of Simone Lowe, a floater CNA.

27. Upon information and belief, Ms. Lowe is of Jamaican national origin.

28. At that time, Yvonne Smith, Marcia Fagan, Diane Adlam, Sandra Gaynor, and Barbara Goodwin, CNAs and friends of Ms. Lowe, upon information and belief, also of Jamaican national origin, began to create a hostile work environment for Plaintiff WILLIAMS.

29. By way of example, when Plaintiff WILLIAMS asked them for assistance with her patients by way of coverage, if she needed to use the restroom or take a break, they would refuse to assist her and would tell her to ask someone else.

30. Rishawn Price, Plaintiff's African American co-worker informed the Plaintiff that Ms. Lowe was stating to coworkers that Plaintiff and Ms. Price were going to take over her job and that she had to leave her employment with Defendant CABRINI.

31. Then, in or around 2018, Ms. Lowe resigned from her position, stating to her peers that she

4

was leaving because Plaintiff WILLIAMS took over her assignment.

32.    After Ms. Lowe resigned, Ms. Smith, Ms. Fagan, Ms. Adlam and Ms. Gaynor increased their hostile treatment of Plaintiff WILLIAMS by telling her that she was a "Yankee who [was] trying to take their assignments."

33.    Furthermore, Ms. Smith, Ms. Fagan, Ms. Adlam and Ms. Gaynor began to make comments based on their perception of Plaintiff WILLIAMS' mental health, stating to Plaintiff that she was "bipolar" and "crazy," in the hallways or staff lounge.

34.    In or around the beginning of 2018, Plaintiff WILLIAMS reported the hostile work environment to which she was subjected by her co-workers to her supervisor at the time, Alexis.

35.    Then, in or around 2018, Defendant THOMAS, also of Jamaican national origin, was hired for the role of Charge Nurse at the One West Unit.

36.    Defendant THOMAS managed the assignments of work and lunch breaks for the CNAs. The CNAs would be assigned lunch breaks during 11:00 a.m. to 11:45 a.m., referred to as "First Break" or during 1:00 p.m. to 1:45 p.m., referred to as "Second Break."

37.    Upon starting her employment with Defendant CABRINI, Defendant THOMAS began to subject Plaintiff to a hostile work environment based on her perception of Plaintiff's mental health.

38.    On a weekly basis, Defendant THOMAS began to call Plaintiff WILLIAMS, "a mad girl," "bipolar," "paranoid" and "crazy." Defendant THOMAS would also say to Plaintiff, "Everyone here knows you're the crazy one on the floor."

39.    Furthermore, Defendant THOMAS would refuse to inform Plaintiff WILLIAMS regarding the care status of a patient from a previous shift, when Plaintiff would take over caring for

5

that patient, thus forcing Plaintiff to ask co-workers about this basic information that she needed to start her shift and begin caring for her patient.

40. Additionally, Defendant THOMAS would frequently assign Plaintiff WILLIAMS "First Break." The CNAs who were assigned "Second Break" were expected to cover the CNAs who were assigned First Break when they were on break.

41. In turn, the CNAs who were assigned First Break were expected to cover the CNAs who were assigned Second Break when they were on break.

42. Every other day, the lunch breaks assignments would alternate between First Break and Second Break.

43. However, Plaintiff WILLIAMS was frequently assigned First Break, without alternation.

44. During First Break Plaintiff WILLIAMS should have been covered by Ms. Gaynor, Ms. Smith or Ms. Fagan, who refused to cover her during her breaks. As such, frequently Plaintiff was not able to take her lunch breaks at all and was forced to work entire shifts without taking a break.

45. Plaintiff WILLIAMS complained to Addie Adano, Assistant to the Director of Nursing about not being able to take lunch breaks.

46. Plaintiff WILLIAMS stated to Ms. Adano that it was unfair to be placed on First Break frequently, since there was no support and coverage from the other CNAs.

47. Plaintiff WILLIAMS also complained to Robin, a union representative, about being placed on First Break frequently, stating that she was not able to take her breaks, since the other CNAs would either refuse to cover her or if they said they would cover her, they would not care for her patients while she was on break.

48. However, neither Ms. Adano nor Robin remedied the situation, as Plaintiff WILLIAMS

6

continued to be placed on First Break frequently and thus continued to be deprived from taking her lunch breaks during her workdays.

49. In or around 2018, Fonderre Musongong was hired as the "Resident Nurse." Within the first weeks of starting his employment with Defendant CABRINI, he mentioned to Plaintiff WILLIAMS that Defendant THOMAS said to him that Plaintiff was "bipolar and crazy," and warned him to "watch out for her."

50. Mr. Musongong also said to Plaintiff WILLIAMS that he asked Defendant THOMAS not to "diagnose [Plaintiff WILLIAMS.]"

51. In or around 2018, Plaintiff WILLIAMS continued to work in the One West Unit with Ms. Smith, Ms. Fagan and Ms. Gaynor and continued to suffer continuous harassment by her co-workers and Defendant THOMAS who called her "crazy," "mad," and "bipolar" on an ongoing and regular basis.

52. Plaintiff WILLIAMS felt hurt and humiliated by the ongoing hostile work environment.

53. Sometime in or around 2018, Plaintiff WILLIAMS and Ms. Goodwin were speaking in the break room when Ms. Goodwin stated to the Plaintiff, "every time I go to Georgia, I see fat Black American women." Ms. Goodwin then asked Plaintiff WILLIAMS, "Why are they so big, fat and wide? [referring to Black Americans]"

54. Plaintiff WILLIAMS felt hurt and humiliated by Ms. Goodwin's overt discriminatory comment.

55. The hostile work environment to which Plaintiff WILLIAMS was subjected on a regular and ongoing basis persisted in 2019.

56. By way of example, on or about January 14, 2019, Plaintiff WILLIAMS arrived at the One West Unit and went to the nurses' station where the CNAs were getting the morning report

7

from Defendant THOMAS.

57. As Plaintiff WILLIAMS arrived, the CNAs looked at the Plaintiff. Suddenly, Ms. Gaynor began to say, "oh, the mad girl must not know" as she, the CNAs and Defendant THOMAS laughed loudly.

58. Plaintiff WILLIAMS did not understand what was happening. At that point, Ms. Price who was walking down the hall and witnessed the interaction, approached the Plaintiff and said, "They are trying to play you. Did you look at the board by the nurses' office?"

59. Confused, Plaintiff WILLIAMS replied "no," left the unit, and proceeded to the board where she saw that her name was moved to Two North and marked "unknown name."

60. Plaintiff WILLIAMS felt hurt and confused and walked back to her unit where she asked Defendant THOMAS and the CNAs why her name was moved to Two North. The CNAs laughed at the Plaintiff.

61. Humiliated, Plaintiff WILLIAMS walked away. As she walked away, she heard one of the CNAs saying that Plaintiff "need[ed] to be put on garden-level with the crazy people."

62. By way of background, "garden level" was the place where Alzheimer's patients were located.

63. Plaintiff WILLIAMS felt hurt and humiliated by the mockery to which she was subjected by her supervisor and co-workers.

64. Plaintiff WILLIAMS then called Ms. Faulkner-Smith and asked why the assignment had been changed, to which Ms. Faulkner-Smith responded that she had not changed her assignment.

65. The following day, Plaintiff WILLIAMS reported back to the One West Unit and noticed that her name had been corrected.

66. In or around 2019, Plaintiff WILLIAMS complained to Mr. Musongong about the harassment to which she was subjected by her co-workers and Defendant THOMAS.

67. Plaintiff also informed Mr. Musongong that one of her patients was terribly ill and that she had reported it to Defendant THOMAS, who refused to listen to Plaintiff's plea to get the patient help and instead rolled her eyes at Plaintiff while Defendant THOMAS continued to type on her computer.  Mr. Musongong assured the Plaintiff that he would look at the patient and added that Defendant THOMAS had said to him that Plaintiff WILLIAMS was "bipolar" and "crazy" when Mr. Musongong had asked Defendant THOMAS about the patient.

68. On or about January 24, 2019, Plaintiff WILLIAMS also complained to Bonnie Burke, Vice President of Operations/Nursing Home Administrator, about the hostile work environment to which Defendant THOMAS and her co-workers were subjecting her. Plaintiff was in tears while explaining the level of harassment to Ms. Burke due to the severity of the conduct.

69. Ms. Burke promised that she would "look into it" but nothing changed.

70. Plaintiff WILLIAMS further reported the hostile behavior to Winonah Joseph, Director of Nursing, who did not take any action to remedy the hostile work environment.

71. While Plaintiff WILLIAMS complained to her superiors multiple times, the hostile work environment to which Plaintiff was subjected on an ongoing basis persisted unremedied.

72. In or around 2019, on a weekly basis, Plaintiff WILLIAMS would walk into the patients' dining room, where, in the presence of patients, Curtis Douglas, a member of the kitchen staff, upon information and belief, also of Jamaican origin; Ms. Smith; Ms. Fagan; Ms. Gaynor, and Christiana Kuaffo made offensive comments about Black Americans being

9

"angry" and "lazy."

73. Unreprimanded for their discriminatory conduct, Plaintiff WILLIAMS' co-workers felt empowered to continue subjecting Plaintiff to a hostile work environment based on her race and national origin.

74. Plaintiff WILLIAMS felt hurt and humiliated by the persistent barrage of offensive comments to which she was subjected on an ongoing basis.

75. Her co-workers also subjected her to harassment and humiliation in the presence of patients. By way of example, Ms. Kuaffo yelled at Plaintiff WILLIAMS calling her "crazy" in the presence of patients. Mr. Musongong was present but did not interfere to remedy the situation.

76. Furthermore, on a daily basis, in or around 2019, her co-workers, Ms. Kuaffo, Ms. Gaynor, and Mr. Douglas called Plaintiff WILLIAMS a "Trumpie" and "lazy American."

77. They also made comments about Black-Americans being "crazy" adding, "that is why the cops are beating them down," as they watched news coverage on CNN on a television set in the dining room. Defendant THOMAS was present in the dining room for some of the comments but did not take any action to remedy the situation.

78. Then, in or around the end of 2019, Defendant THOMAS left her employment with Defendant CABRINI and a new group supervisor, Defendant BARRETT, upon information and belief, of Phillipinean origin, was hired as the Nursing Manager for the One West Unit.

79. As soon as Defendant BARRETT commenced her employment with Defendant CABRINI, she began to subject Plaintiff WILLIAMS to a hostile work environment based on her perception of Plaintiff's mental health.

80. On a daily basis, Defendant BARRETT would say to Plaintiff WILLIAMS that she was "overly sensitive" and "paranoid."

81. Also, when Plaintiff WILLIAMS would approach her about work, Defendant BARRETT would say to Plaintiff, "What is it now? God!" expressing annoyance and frustration at the mere presence of Plaintiff approaching her. Furthermore, Defendant BARRETT would look at Plaintiff up and down and roll her eyes at her.

82. Then, in or around 2019, during a meeting with Defendant BARRETT, Ms. Smith, Ms. Kuaffo, Kenisha Black, and Yvonne Rickets, Plaintiff WILLIAMS complained to Defendant BARRETT about the offensive and discriminatory treatment to which her co-workers subjected her.

83. In response, Defendant BARRETT audaciously said to Plaintiff WILLIAMS, "Oh Nikeia be quiet, we all know that you are paranoid, bipolar and crazy."

84. Shocked, Plaintiff WILLIAMS replied, "Are you my doctor? Are you diagnosing me?" Plaintiff then added, "You are a supervisor here and you are calling me bipolar and crazy. Are you serious?"

85. Plaintiff WILLIAMS felt hurt and humiliated by Defendant BARRETT's offensive comments.

86. Defendant BARRETT simply looked at Plaintiff WILLIAMS and rolled her eyes.

87. Under Defendant BARRETT's supervision, Plaintiff WILLIAMS continued to be subjected to a hostile work environment by her co-workers, which persisted in 2020.

88. In or around 2020, on various occasions, Mr. Douglas began to purposely delay serving Plaintiff WILLIAMS' patients their breakfast.

89. Breakfast was expected between 7:45 a.m. and 8:45 a.m. at the latest. However, Mr.

11

Douglas would prepare Plaintiff WILLIAMS' food trays late, so her patients were eating after 9:00 a.m. most of the time.

90.  On one occasion, upon receiving her breakfast, one of Plaintiff WILLIAMS' patients complained that it was 9:15 a.m. and that her breakfast was cold.

91.  Plaintiff WILLIAMS reported this incident to Mr. Douglas' supervisor, Albert Bussey and to Chief Dietician of the Food Service Department, Jordan Lynch.

92.  After Plaintiff WILLIAMS complained to Mr. Douglas' supervisor, Defendant BARRETT approached Plaintiff and furiously stated, "How dare you complain to Albert? This is my unit! You and this reporting gotta stop. Curtis is a good worker!"

93.  Plaintiff WILLIAMS felt threatened and intimidated by Defendant BARRETT's aggressive behavior, through which Defendant BARRETT patently attempted to deter Plaintiff from complaining about the hostile work environment she endured.

94.  In 2020, Plaintiff WILLIAMS' co-workers, Ms. Kuaffo, Ms. Gaynor and Mr. Douglas continued to subject Plaintiff to offensive epithets, on the basis of her race and national origin, undeterred.

95.  By way of example, in or around March 2020, Plaintiff WILLIAMS was in the staff lounge and overheard Ms. Fagan, Ms. Gaynor, Ms. Kuaffo, Mr. Douglas, and Elaine Wynn talking about Plaintiff being a "Trumpie" and "want[ing] to seem them deported."

96.  Ms. Wynn also stated, "Well, at least we have a country to go back to. Them Yankees don't have no home to go to."

97.  Plaintiff WILLIAMS continued to feel humiliated and degraded by her peers and their derogatory comments about Plaintiff, Black Americans, and her mental health.

98.  Plaintiff WILLIAMS complained to HR; supervisors, including Mr. Buzzie and Ms.

12

Lynch; employees of the Rehabilitation Department; as well as Robin, her union representative about the hostile work environment, to no avail.

99. Plaintiff WILLIAMS felt that she no longer had an identity at her job. Her peers never addressed her by her name; instead, they referred to her as "the crazy, bipolar one," and "Trumpie."

100. Then, in or around the Spring of 2020, Ms. Lynch began helping Plaintiff WILLIAMS to get the food trays from Mr. Douglas, so that her patients could be served on time.

101. Employees who worked in the Physical Therapy Department, Doris, Imie, Anthony, and Cheryl, also began to notice that Mr. Douglas was delaying the process and would also help Plaintiff WILLIAMS get the trays, so that the patients would be served on time.

102. Then, in or around November 2020, Plaintiff WILLIAMS put her name on the "holiday off list" requesting Christmas Day off. Due to her seniority, she was entitled to priority.

103. In or around December 2020, Plaintiff WILLIAMS noticed that her request had been denied and that Christmas Day had been given to Ms. Gaynor, who had been with the agency for a shorter period of time, upon information and belief, since 2007.

104. Plaintiff WILLIAMS complained to Ms. Faulkner-Smith and her union representative, Georgia Castle, about the unfair decision.

105. When Plaintiff WILLIAMS approached Ileen Hernandez, Assistant to Ms. Joseph, about the denied request, Ms. Hernandez stated to Plaintiff that it was because so many people were pressuring Ms. Hernandez for Christmas off, but after speaking with Ms. Hernandez Plaintiff was given the day off.

106. Subsequently, Plaintiff WILLIAMS walked to the staff lounge and overheard Ms. Gaynor and Ms. Fagan talking about the Plaintiff while laughing, stating, "Them Yankees don't

celebrate Christmas; their holiday is New Year's because they love to drink."

107. Continuously faced with discriminatory treatment, in or around December 2020, Plaintiff WILLIAMS complained to Ms. Castle, about the harassment to which she was subjected by her co-workers in the One West Unit, including the discriminatory comments made by Ms. Gaynor and Ms. Fagan in the staff lounge.

108. Ms. Castle informed Plaintiff WILLIAMS that she spoke with her co-workers and stated to them that they should stop making discriminatory comments in the workplace.

109. Then, on or about December 9, 2020, Plaintiff WILLIAMS was on her way out of the building, when a front desk employee informed her that Ms. Faulkner-Smith wanted to meet with her.

110. When Plaintiff WILLIAMS walked into the HR office, Ms. Faulkner-Smith stated that she wanted to discuss the reason Plaintiff was not scheduled off on Christmas Day.

111. Ms. Faulkner-Smith informed Plaintiff WILLIAMS that Ms. Hernandez mentioned that Plaintiff had requested time off during two holidays. Ms. Hernandez picked one because Plaintiff was only allowed to take one holiday off.

112. Plaintiff WILLIAMS responded that was incorrect, explaining that New Year's Day was Plaintiff's scheduled day off and she had requested to switch her day off to Christmas Day.

113. As she continued to discuss her work environment, Plaintiff WILLIAMS complained to Ms. Faulkner-Smith that she was being subjected to discrimination by Defendant BARRETT and her co-workers because she is a Black American.

114. Plaintiff WILLIAMS stated that she overheard Ms. Gaynor and Ms. Fagan in the breakroom stating that they did not know why Plaintiff WILLIAMS was even requesting Christmas off because, "them Yankees don't celebrate Christmas; their holiday is New

14

Years because they love to drink."

115. Plaintiff WILLIAMS also complained to Ms. Faulkner-Smith that the CNAs continued to spread rumors and slander Plaintiff's reputation by telling all the staff that Plaintiff was "bipolar" and "crazy."

116. At this point, Plaintiff WILLIAMS began crying and stated that when she complained about this to her supervisor, Defendant BARRETT, Defendant BARRETT responded by stating that Plaintiff was "bipolar" and "paranoid" in the presence of the other CNAs.

117. Plaintiff WILLIAMS also complained to Ms. Faulkner-Smith about Mr. Douglas purposely serving her patients late.

118. Plaintiff WILLIAMS further reported to Ms. Faulkner-Smith that she heard Mr. Douglas talking to Ms. Gaynor and Ms. Fagan about Americans being "lazy."

119. Plaintiff WILLIAMS also informed Ms. Faulkner-Smith that when she had previously reported patient neglect to Defendant BARRETT, Defendant BARRETT gave her a blank stare and continued to call her "paranoid."

120. At the conclusion of this meeting, Ms. Faulkner-Smith stated that she would "look into it." However, days passed, and nothing was addressed.

121. Then, on or about December 23, 2020, upon information and belief, a dietician, Suzan Montelon, asked Ms. Kuaffo, who was sitting close to a resident about to receive physical therapy (hereinafter "Resident A") to help her with Resident A, as Resident A needed to go to the bathroom.

122. Upon information and belief, Ms. Kuaffo responded that Resident A was not her resident but "Nikeia's resident."

123. Ms. Montleon then went into another room where Plaintiff WILLIAMS was showering

15

another resident (hereinafter "Resident B") and told Plaintiff that Resident A needed bathroom assistance.

124.  Resident B responded to Ms. Montleon that she was in the middle of being bathed and that the individual who was covering the Plaintiff should help take Resident A to the bathroom.

125.  Ms. Montleon left and went back to Ms. Kuaffo to ask for assistance again.  Upon information and belief, Ms. Kuaffo restated that Resident A was not her patient.

126.  Ms. Montleon then returned to Plaintiff WILLIAMS, informed her of Ms. Kuaffo's response and added, "Can you believe Christiana [referring to Ms. Kuaffo] is just sitting there?"

127.  Shortly thereafter, Plaintiff WILLIAMS walked into the patients' dining room and found Patient A covered in feces and urine, sitting there, in the presence of the other patients, humiliated.

128.  When Plaintiff WILLIAMS asked Ms. Kuaffo why the patient had been neglected, Ms. Kuaffo said to the Plaintiff, "What were you doing? You clean her shit!"

129.  Plaintiff WILLIAMS subsequently complained to Defendant BARRETT about the incident and about not receiving any support or coverage from the other CNAs, at which time, Defendant BARRETT once again said to Plaintiff that she was "paranoid."

130.  Plaintiff WILLIAMS stated to Defendant BARRETT that the hostile behavior that she was facing from her co-workers affected the patients the most.

131.  Later that day, Defendant BARRETT called a meeting with Plaintiff WILLIAMS, Ms. Kuaffo and Taneka Balahi, a union delegate.

132.  Plaintiff WILLIAMS recounted the events of the incident with Ms. Kuaffo and the patient.

133.  Defendant BARRETT then asked Ms. Kuaffo what she was doing at that time, to which

Ms. Kuaffo stated that she was monitoring other patients.

134. Defendant BARRETT then turned to Plaintiff WILLIAMS and stated, "See Nikeia, she was monitoring, you gotta stop this!"

135. Ms. Kuaffo jumped in and stated that Plaintiff WILLIAMS was "always reporting people."

136. Ms. Kuaffo then audaciously added, "We need to get her off this floor."

137. Then, on or about December 28, 2020, as Plaintiff WILLIAMS returned from her lunch break, Ms. Goodwin informed Plaintiff that her patient (hereinafter "Resident C") was ringing the bell for assistance.

138. Ms. Goodwin or Ms. Fagan were expected to cover Plaintiff WILLIAMS while she took her lunch break.

139. Plaintiff WILLIAMS, who was just returning from her break, immediately headed to Resident C's room to help her.

140. When Plaintiff WILLIAMS arrived at the room, she saw Sandi Schreier, the Director of Social Work, sitting on a chair by the window.

141. Plaintiff WILLIAMS asked Resident C how she was doing and if she needed anything.

142. Resident C stated she needed to go to the bathroom and Plaintiff WILLIAMS helped her.

143. Ms. Schreier then informed Plaintiff WILLIAMS that Resident C had been ringing the bell for help. Plaintiff responded that she had just finished her break and was just asked to tend to the resident upon returning.

144. Then, on or about January 6, 2021, Ms. Hernandez informed Plaintiff WILLIAMS that she had a scheduled meeting with Ms. Joseph ("January 6 meeting.")

145. Plaintiff WILLIAMS attended the meeting with her union representative, Ms. Castle. Ms. Adano was also present.

17

146. Ms. Joseph stated that the meeting was called to address Plaintiff WILLIAMS' alleged "abuse of a patient" that had taken place on December 28, 2020.

147. Plaintiff WILLIAMS asked for details of the alleged abuse.

148. Ms. Joseph responded that Ms. Schreier had alleged that she had seen Plaintiff WILLIAMS snatch a bell from Resident C and proceed to yell at the patient "Why are you ringing this bell? Didn't I take this away from you?"

149. According to Ms. Joseph, Ms. Schreier had further alleged that the patient was protesting and stating, "Please don't yell at me, I'm just trying to go to the bathroom."

150. Plaintiff WILLIAMS was shocked by the outright misrepresentation of what had taken place and began to cry.

151. Plaintiff WILLIAMS believed that Ms. Schreier misrepresented what took place because she was a friend of Defendant BARRETT and Ms. Fagan and was motivated by discriminatory and retaliatory bias toward her.

152. Then, Ms. Joseph asked Plaintiff WILLIAMS why she was "displaying such emotion."

153. Ms. Adano added, "Wow, you can cry like that? I feel bad for the residents in your care."

154. Plaintiff WILLIAMS tried to explain that her tears were due to the retaliation she had experienced since she reported a hostile work environment and racial discrimination against her from Defendant BARRETT and her co-workers to Ms. Faulkner-Smith.

155. Plaintiff WILLIAMS also stated that in her seventeen years of working for Defendant CABRINI, she had never been reported or written up for patient abuse or neglect.

156. As a result of the meeting, Ms. Joseph decided to immediately remove Plaintiff WILLIAMS from the One West Unit and transfer her to the Three North Building for "abuse of resident."

18

157. Plaintiff WILLIAMS refused to sign the write up.

158. Ms. Joseph stated that if Plaintiff WILLIAMS was brought back to the office for anything else, she would be "out the door."

159. Plaintiff WILLIAMS believes that she was written up for the alleged incident with Resident C, in retaliation for complaining about discrimination.

160. Then, on or about January 7, 2021, Plaintiff WILLIAMS reported to her new assignment at the Three North Unit.

161. That afternoon, Plaintiff WILLIAMS went into the nurse's station where all patient charts were kept and began working on the computer at the station.

162. Suddenly, patient charts that were on a cabinet fell onto Plaintiff WILLIAMS and struck her on the head.

163. Dawn Badini, Nurse Manager, advised Plaintiff WILLIAMS to go to the ER due to the head injury.

164. Ms. Badini also wrote an incident report and sent it to Ms. Joseph.

165. Ms. Badini called an ambulance and Plaintiff WILLIAMS was taken to the hospital.

166. After she was examined, the ER doctor instructed Plaintiff WILLIAMS to stay home for three days.

167. Then, on or about January 11, 2021, Plaintiff WILLIAMS wrote an email to Ms. Faulkner-Smith about the January 6 meeting ("January 11 email.")

168. In the email, Plaintiff WILLIAMS expressed her belief that what happened to her was "collaboration retaliation against [her]."

169. Plaintiff WILLIAMS stated that in her time working for Defendant CABRINI she had "never been called for mistreating any patient" and that she had "always treated every

resident with dignity and respect."

170. Subsequently, Plaintiff WILLIAMS continued to feel targeted in the workplace.

171. During a staff meeting on or about February 9, 2021, to continue bringing attention to the hostile work environment she endured at Defendant CABRINI, Plaintiff WILLIAMS asked Ms. Faulkner-Smith if it was okay for coworkers to single out people and call them "crazy Americans."

172. Ms. Faulkner-Smith simply replied, "We are all American."

173. Suddenly, one of the nurses, Alicia Elwood, shouted, "I am not American, I am a proud Jamaican. I could never be American."

174. Ms. Faulkner-Smith replied, "As long as you are here, you are American." However, she did not address the discriminatory comments about Americans.

175. Plaintiff WILLIAMS stated, "You see Simone? This is what I have to deal with."

176. After the meeting ended, Ms. Faulkner-Smith instructed Plaintiff WILLIAMS to stop by her office for a copy of the January 6, 2021 write-up.

177. Then, on or about February 11, 2021, Ms. Faulkner-Smith approached Plaintiff WILLIAMS, as she was returning to her unit after her break and instructed Plaintiff to accompany her to Ms. Adano's office to address Plaintiff's January 11 email.

178. Plaintiff WILLIAMS asked Ms. Faulkner-Smith if she could let Ms. Badini know where Plaintiff was going because Plaintiff had a patient waiting for her.

179. Ms. Faulkner-Smith responded that she had already called Ms. Badini to let her know where Plaintiff would be.

180. At the meeting ("February meeting with Ms. Faulkner-Smith and Ms. Adano") which she attended with union delegate, Johnny Luctomus, Plaintiff WILLIAMS again complained

to Ms. Faulkner-Smith about the discrimination and hostile work environment she was facing at Defendant CABRINI.

181. Plaintiff WILLIAMS stated that she felt that Defendant BARRETT and Ms. Schrier collaborated on the story of alleged patient abuse to get Plaintiff WILLIAMS out of the One West Unit.

182. Ms. Faulkner-Smith responded that if Ms. Schrier was a liar, she would call Ms. Schrier in to address the issue.

183. Ms. Faulkner-Smith then proceeded to antagonize Plaintiff WILLIAMS by calling Ms. Schrier into Ms. Adano's office and telling Plaintiff, "Tell her [referring to Ms. Schrier] to her face that she is a liar!"

184. Plaintiff WILLIAMS responded that she did not call Ms. Schrier "a liar" but that she stated that the story that Ms. Schreier told was not the truth.

185. Plaintiff WILLIAMS added that if Ms. Schreier truly suspected that Plaintiff abused the patient, Ms. Schreier would not have given Plaintiff privacy to continue being with the patient alone, instead of protecting the patient.

186. Ms. Schreier responded, "I saw what I saw."

187. Plaintiff WILLIAMS added that if Ms. Schreier truly thought that Plaintiff was abusing the patient, she would have taken Plaintiff off the assignment with the patient and off the floor, but the patient remained under Plaintiff's care until approximately January 6, 2021.

188. Seemingly not knowing how to respond, Ms. Schreier said to Ms. Faulkner-Smith, "I am a busy person, Simone. I am going."

189. Plaintiff WILLIAMS felt attacked and began to cry.

190. Ms. Adano then stated, "With that display of emotion, I wonder about the residents you

care for."

191. Plaintiff WILLIAMS responded that her tears were due to the disbelief and hurt that this was all happening and that her tears did not reflect her work ethic.

192. Plaintiff WILLIAMS left the meeting in tears.

193. Then, on or about February 28, 2021, continuing to feel targeted and humiliated, Plaintiff WILLIAMS wrote an email ("email regarding the February meeting with Ms. Faulkner-Smith and Ms. Adano") to Ms. Faulkner-Smith, Ms. Joseph and Patrick Duncan, union representative, expressing that she was very uncomfortable at the February meeting with Ms. Faulkner-Smith and Ms. Adano, which she left feeling "misunderstood and isolated" due to the conduct of Ms. Faulkner-Smith and Ms. Adano toward her.

194. In her email, amongst other things, Plaintiff WILLIAMS complained of retaliation specifically stating, "As soon as I reported a hostile work environment and racial discrimination against me to HR on 12/09/2020 I was written up on 1/6/2021 about abusing a patient on 12/29/2020. The very patient I was written up for I was taking care of with no complaints."

195. Plaintiff WILLIAMS added, "I believe this retaliation is happening because of the incident I reported regarding racial discrimination."

196. In another email to Ms. Faulkner-Smith, Ms. Joseph and Mr. Duncan, on that same day, Plaintiff WILLIAMS also requested to float due to the stress and fear that her work environment was causing her, which was affecting her physical and mental health, explaining that she had to interact with Ms. Schrier, whose office was located in the Three North Unit to which Plaintiff was assigned, who had made a false statement against her on December 29, 2020.

197. Plaintiff WILLIAMS expressed that Ms. Schrier's accusation caused "fear, uncertainty, mistrust and discomfort in those working around [her]" and added that floating would be the best way for her to "continue to give the upmost care and attention to every patient in the facility."

198. Soon thereafter, on or about March 4, 2021, in another act of retaliation, Plaintiff WILLIAMS received another disciplinary notice due to "excessive absences."

199. The notice stated that Plaintiff WILLIAMS did not provide an excuse for being absent on 1/8/21, 2/2/21, 2/9/21, 2/17/21-2/19/21, 2/22/21, 2/25/21, 2/27/21-2/28/21.

200. Plaintiff WILLIAMS refused to sign. Plaintiff was out on 1/8/21 due to the 1/7/21 workplace incident that sent her to the ER.

201. On 2/2/2021, the agency had a Snow Emergency date.

202. For the rest of the absences, Plaintiff WILLIAMS had doctor's notes, which she had submitted to Ms. Castle.

203. Then, on or about March 10, 2021, Plaintiff WILLIAMS received an email from Ms. Faulkner-Smith, attaching an Interoffice Memorandum with the subject line "Your Email Letter Dated 2/28/2021" in response to Plaintiff's email regarding the February meeting with Ms. Faulkner-Smith and Ms. Adano.

204. In the memorandum, Ms. Faulkner-Smith conveyed that she regretted that Plaintiff WILLIAMS left the February meeting with Ms. Faulkner-Smith and Ms. Adano "feeling misunderstood and isolated."

205. Ms. Faulkner-Smith claimed that the "purpose of calling the meeting was due to [Plaintiff WILLIAMS] reporting that [she] felt targeted and believe[d] that Ms. Schreier had fabricated the report of negative interaction due to an ulterior motive."

23

206. Ms. Faulkner-Smith also stated that she had wanted Plaintiff WILLIAMS to speak directly to Ms. Schreier about the incident.

207. Ms. Faulkner-Smith continued that she wanted to clear the record on Ms. Adano's statement about Plaintiff WILLIAMS crying during the meeting, claiming that Ms. Adano was referring to the "abject defensiveness" Plaintiff allegedly displayed in the meeting. Ms. Faulkner-Smith denied Ms. Adano "saying anything about the fact that [Plaintiff was upset or crying.]"

208. Ms. Faulkner-Smith then added:

> In addition, this is the first time that I am hearing from you that you believe the disciplinary action is related to due to a report made to Human Resources. I want the record to be dear that I never spoke with or mentioned to Margot Barrette, RN that you complained about your unit on 1 West. I also want to clarify that you mentioned discrimination to me when you initially reported about staff interaction on 1 West and the persons you accused are of the same racial background as you. You mentioned that you felt discriminated against because of your national origin and comments that you reported coworkers made about your national origin. It is important to mention that your concerns were taken seriously and addressed with the staff by me, without mentioning the source.

209. Ms. Faulkner-Smith also opined, "there is no evidence of retaliation."

210. Lastly, Ms. Faulkner-Smith acknowledged Plaintiff WILLIAMS' request to float and stated that she would accommodate that request "to the extent possible." However, Plaintiff's request was not granted.

211. Then, on or about March 17, 2021, Plaintiff WILLIAMS received another disciplinary notice for "Failure to Follow Cabrini Policy-Parking in Visitor's Only Section."

212. The memo stated that Plaintiff WILLIAMS had been notified that visitation had resumed since March 15, 2021 and that employees were told not to park in visitor spots.

213. While other employees continued to park in the same area (which was an area newly

designated as a visitor spot and which Plaintiff was not aware was a designated visitor spot) upon information and belief, Plaintiff WILLIAMS was the only employee who was reprimanded for parking in that section.

214. It is clear, based on the temporal proximity between Plaintiff WILLIAMS' complaints of discrimination and retaliation and the disciplinary actions to which she was subjected, that Defendants subjected Plaintiff to disciplinary actions in retaliation for her complaints of discrimination and retaliation.

215. Then, on or about May 6, 2021, Plaintiff WILLIAMS was in the patients' dining room, when she heard a member of hospice care and two CNAs, Julietta and Natalie, upon information and belief, both of Jamaican national origin, speaking about American food looking like "throw-up" and stating that Americans "eat so unhealthy" because "everything is processed in this country" and "nothing is fresh."

216. Plaintiff WILLIAMS complained to Ms. Badini about the comments. Ms. Badini shared with the Plaintiff that she heard the Jamaican employees making derogatory comments about White people as well, such as White people being happy about what happened to George Floyd. Ms. Badini then continued by stating, "Don't go to Simone (referring to Ms. Faulkner-Smith) because she will not hear you; I tried."

217. The above are some of the discriminatory and retaliatory acts to which Plaintiff was subjected on the basis of her race and national origin.

218. As a result of the acts and conduct complained of herein, Plaintiff has suffered severe emotional and physical distress.

219. Defendants' actions and conduct were intentional and intended to harm Plaintiff.

220. As a result of the above, Plaintiff has been damaged in an amount which exceeds the

jurisdiction limits of the Court.

221. Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law. As such, Plaintiff demands punitive damages as against all Defendants, jointly and severally.

## FIRST CAUSE OF ACTION
## <u>DISCRIMINATION UNDER TITLE VII</u>
(Against Defendant CABRINI)

222. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

223. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, for relief based upon the unlawful employment practices of the above-named Defendant CABRINI. Plaintiff complains that Defendant CABRINI violated Title VII's prohibition against discrimination based, in whole or in part, upon an employee's race and national origin (Black American).

224. Defendant CABRINI engaged in unlawful employment practices prohibited by 42 U.S.C. § 2000e–2(a) by discriminating against Plaintiff because of her race and national origin:

> It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

225. Defendant CABRINI engaged in unlawful employment practices prohibited by Title VII, by discriminating against Plaintiff and subjecting her to a hostile work environment because of her race and national origin.

26

226. Accordingly, as a result of the unlawful conduct of Defendant CABRINI, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to her under this statute.

## SECOND CAUSE OF ACTION
## DISCRIMINATION UNDER THE NYSHRL
(Against All Defendants)

227. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

228. Executive Law § 296 provides that:

> It shall be an unlawful discriminatory practice: "(a) For an employer or licensing agency, because of an individual's age, **race**, creed, color, **national origin**, sexual orientation, military status, sex, **disability**, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

229. Defendants engaged in an unlawful discriminatory practice by discriminating against the Plaintiff because of her race and national origin (Black American) as well as perceived disability.

230. Accordingly, as a result of the unlawful conduct of Defendants, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to her under this statute.

## THIRD CAUSE OF ACTION
## RETALIATION UNDER THE NYSHRL
(Against All Defendants)

231. Plaintiff WILLIAMS repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

232. New York State Executive Law § 296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section

27

applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

233. Defendants violated the section cited herein as set forth.

234. Accordingly, as a result of Defendants' unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to her under this statute.

## FOURTH CAUSE OF ACTION
## AIDING AND ABETTING UNDER THE NYSHRL
(Against Defendant THOMAS and Defendant BARRETT)

235. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

236. New York State Executive Law § 296(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

237. Defendants engaged in an unlawful discriminatory practice in violation of New York State Executive Law § 296(6) by aiding, abetting, inciting, compelling and coercing the discriminatory conduct.

238. Accordingly, as a result of the unlawful conduct of Defendant THOMAS and Defendant BARRETT, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to her under this law.

## JURY DEMAND

239. Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A. Declaring that Defendants engaged in, and enjoining Defendants from continuing to engage in, unlawful employment practices prohibited by the Title VII of the Civil Rights

28

Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq* and the New York State Human Rights Law, New York State Executive Law § 296, *et seq.*, in that the Defendants discriminated against Plaintiff on the basis of her national origin and race (Black American) and perceived disability and retaliated against her, due to her complaints of discrimination.

B.      Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendants' unlawful discrimination and retaliation and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

C.      Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

D.      Awarding Plaintiff punitive damages;

E.      Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

F.      Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy Defendants' unlawful employment practices.

Dated: New York, New York
       January 18, 2022

                                        **PHILLIPS & ASSOCIATES,
                                        ATTORNEYS AT LAW, PLLC**

By:     _____
        Dorina Cela, Esq.
        Hannah Kucine, Esq.
        *Attorneys for Plaintiff*
        45 Broadway, Suite 430
        New York, New York 10006
        (212) 248-7431
        dcela@tpglaws.com
        hkucine@tpglaws.com